## THE POLING BROS. NO. 5.

### Petition of CHESTER A. POLING, Inc. THE TOM WOGAN.

### CHESTER A. POLING, Inc., v. DAHL et al.
### No. 240.

Circuit Court of Appeals, Second Circuit.
March 14, 1938.

Alexander, Ash & Jones, of New York City (Edward Ash and Lawson R. Jones, both of New York City, of counsel), for petitioner-appellant Chester A. Poling, Inc.

Otto, Easterday & Warburton, of New York City (George B. Warburton, of New York City, of counsel), for Claimant-Appellee Albert Dahl.

Thomas J. O'Neill, of New York City (John T. Little and George B. Warburton, both of New York City, of counsel), for claimants-appellees Frank Paschall and others.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On October 30, 1936, Frederick Snare Corporation was constructing a bridge across the inlet from Barren Island to Rockaway Point. To accomplish this purpose it was building a series of cofferdams extending from one shore line to the other and numbered, respectively, from 1 to 12. Cofferdam No. 12 was on the Barren Island or northerly shore, whereas abutment No. 1 was on the southerly Rockaway shore. About at midchannel were two cofferdams No. 8 and No. 7 between which vessels could navigate. The space between cofferdams 8 and 7 when they were completed was to furnish 500 feet of navigable water which at the time embraced in the present proceeding was reduced by sheathing around the cofferdams and by a lighter moored to the northerly side of cofferdam No. 7 to about 300 feet through which vessels could pass. On October 30, 1936, the appellant's tug Poling Bros. No. 5 (hereinafter called No. 5) running light, and making about 6 miles, was approaching the interval between No. 7 and No. 8, having come down Island Channel from a northerly direction and passed Buoy N—2 on her port. Balken, who was the master of No. 5 and was at the wheel, testified that she straightened up when about three to four hundred feet east of the cofferdams in order to pass through the gap and was at that time about on a parallel course with Socony Tug 21 and Socony Barge 10, which had come down Beach Channel from the east and were likewise approaching the interval between the cofferdams. When the Socony barge was but a short distance off the abutment, the master of her tug Socony 21 for the first time saw the Wogan, a small tug which had left cofferdam No. 8, backed out in a northeasterly direction, and was proceeding to cross to No. 7 where she was to land about thirty workmen who were engaged in the bridge construction. Her speed was from about two to two and a half miles per hour. No. 5 was then lapping the stern of Socony barge 10 on the starboard side of the latter. The Wogan was used in carrying materials and transporting workmen for the job. As soon as the Socony tug 21 saw the Wogan starting toward cofferdam No. 7, she blew an alarm. Balken, the master of No. 5, promptly followed the danger signal of Socony tug 21 by a similar signal from his

tug, but the Wogan came on and, though both she and No. 5 reversed, it was too late to avoid a collision. The court below found that the collision occurred from about 200 to 300 feet easterly of the line of the abutments and we see no reason to differ with this finding.

The District Judge held both No. 5 and the Wogan at fault and entered an interlocutory decree allowing recovery from No. 5 of half damages for the injuries to the Wogan (which was sunk as a result of the collision) but full recovery for injuries to and loss of personal effects of workmen on board the Wogan who had suffered from the collision. The owner of No. 5 has appealed, and the owner of the Wogan has filed cross-assignments of error. We think the Wogan was solely at fault.

The District Judge was of the opinion that when the Wogan shaped her course to cross to abutment No. 7 she was probably about 2,000 feet away from the abutment. As a result of this estimate, he reached the conclusion that the Wogan had time enough to cross without danger of collision and was a privileged vessel which was sacrificed by the neglect of No. 5 to observe her movements promptly and to obey the starboard hand rule. He added that No. 5 neglected to observe Regulation No. 1490 of the Department of Commerce relating to the work at Rockaway inlet which provided that: "Navigators are warned to reduce speed and give the work as wide a berth as possible."

The court held that the Wogan was at fault for failure to post a lookout and to maintain her course and speed and consequently allowed her only half damages for injuries resulting from the collision.

No question is made as to the right of the appellant Chester A. Poling, Inc., to limit her liability under sections 4283 to 4285 of the United States Revised Statutes, as amended, 46 U.S.C.A. §§ 183, 185, and the District Court held that such right existed.

The difficulty with holding that No. 5 was at fault for violation of the starboard hand rule is that the latter never had a chance to avoid a collision after she had reason to realize that the Wogan had entered upon a course which would pass in front of No. 5 and the Socony tug and float.

The Wogan backed away from cofferdam No. 8 when she started and got to a point about 200 feet east and north of the line of the cofferdam before she straightened out and shaped her course to cross to No. 7. From the point where she began to shape her course she would evidently have to proceed at least 200 feet to the south to get to the point of collision, which Judge Byers found was about two-fifths of the way across the space between the two piers. In doing this she would have to cover 200 feet plus the width of the cofferdam and the distance she was north of it. It would take her, when proceeding at the rate of 2½ miles per hour, one minute to cover 220 feet, or from one to two minutes to traverse the distance between the place where she shaped her course to cofferdam No. 7 and the place of collision, if allowance is made for the width of cofferdam No. 8, the distance to the north of it, and the loss of headway when the engines were reversed. No. 5 proceeding at 6 miles per hour would cover 528 feet per minute, or from 528 to 1,056 feet in the same period, even if no allowance is made for loss of headway when the engines were reversed. Therefore, No. 5 was nowhere near 2,000 feet from the abutments when the Wogan, after backing out, started to cross to cofferdam No. 7, but only from 528 to 1,056 feet from the place of collision and at most 1,356 feet from the abutments.

It accordingly seems manifest that the conclusion of the District Court that the Wogan had time to cross safely to No. 7 and was justified in laying a course for that abutment when she did was erroneous. The distance of No. 5 from the abutments was much less than 2,000 feet, and the two vessels were so close to one another that the Wogan had no right to shape a course which lay across the bows of No. 5 and the Socony tug and tow. The testimony of the Socony witnesses, who appear to have had no interest in the controversies between No. 5 and the Wogan, to the effect that only a very short interval elapsed between the time the Wogan left the cofferdam and the time of the collision, is borne out by the probabilities of the case.

It is argued that No. 5 did not slow down when approaching the gap as required by Regulation No. 1490 of the Department of Commerce, but we cannot regard the rule as requiring a lower speed than 6 miles per hour in view of the circumstances. She had no reason to anticipate that the Wogan would attempt to cross

404

to cofferdam No. 7 when three vessels were approaching the gap and there was no chance to avoid the Wogan except by knowing her purpose and by acting with extraordinary promptitude. No. 5 had no opportunity to determine that the Wogan was on a course or was attempting her fantastic maneuver until it was too late to do more than she did, namely, blow an alarm and reverse and back.

For the foregoing reasons the decree should be reversed, with costs, and exoneration granted to the petitioner-appellant.